PAGE and others *against* LENOX and MAITLAND.

*American goods were captured by the British and carried into Futa, a Swedish island, but then in the possession of the British, and completely under their control, Sweden, at that time being at war with Great Britain:*

THIS was an action of *trover,* tried before Mr. *J. Yates,* at the *New-York* sittings, in *November,* 1816.

The agent of the plaintiffs purchased a large quantity of *German* linens at *Hamburg,* on the account, and with the funds of the plaintiffs, with which he proceeded from *Hamburg* with intention to transport them to *Copenhagen,* there

*the goods, while at Futa, were proceeded against as prize in the court of admiralty in England, and pending the proceedings, peace was concluded between Great Britain and Sweden, and the goods were, afterwards, condemned, without ever having been in Great Britain.   Held, that the condemnation was legal, and devested the property of the original owners.*

*Whether a court of admiralty sitting in one country can adjudicate upon property captured as prize of war, and taken into a neutral territory, and never coming within the jurisdiction of the court? Quære.*

*But it may adjudicate upon a prize carried into the ports of an ally in the war.*

to be shipped for the *United States.* The *Danish* sloop *St.* Jorgen, on board of which the goods were laden for *Copenhagen*, was obliged, by adverse winds, to put into a port in the *Danish* dominions, and while lying there was, on the 24th of *May*, 1812, cut out and captured by the boats of the *British* frigate *Helder*, and sloop of war *Bellette.* The sloop and her cargo were sent by the captors to, and, about the middle of *July*, arrived at, *Futa*, a small island near *Wingo* sound, and 16 or 17 miles west of *Gothenburg*, within the *Swedish* dominions, but at that time in the possession of the *British*, having been taken by Vice Admiral Sir *James Saumarez*, during the war between *Great Britain* and *Sweden*, which commenced in 1810, and was terminated by the treaty of peace signed by the ministers of the two powers on the 18th of *July*, 1812, and ratified by *Sweden* on the 18th of *August*, following. This island was used as a place of rendezvous by the *British*, for the prosecution of their commerce in the *Baltic*, and was held without the permission or consent of *Sweden*, although the war was merely nominal, *Sweden* having been forced into the contest by *Napoleon.* The intercourse between *Futa* and *Gothenburg*, was unrestricted, and *Swedish* vessels passed the *British* fleet without molestation ; but the island was still under the complete control of the *British.* Commissioners were established for the purpose of taking the examinations of the masters and owners of prizes brought in there, and forwarding them and the captured vessels to the judge of the court of admiralty in *England.* These commissioners had previously resided at *Gothenburg*, with the consent of the *Swedish* government ; but on the breaking out of the war, transacted their official business at *Futa.* Proceedings were instituted in the *English* court of admiralty against the *St. Jorgen*, and her cargo, while at *Futa*, (where, on her arrival, the preliminary examinations were taken by the commissioners, and with the papers were sent to *England*,) and they were condemned, on or about the 2d of *September*, 1812. After the condemnation, the captors sold the goods in question, being the greater part of the linens originally purchased by the agent of the plaintiffs at *Hamburg*, to one *Dickenson* of *Gothenburg*, who sold the same to *Low* and *Smith* of the

ALBANY,    same place, by whom they were sent to *New-York*, consign-
January, 1818.  ed to the defendants.

PAGE.          A verdict was taken for the plaintiffs, for 50,000 dollars,
v.
LENOX.     subject to the opinion of the court.

The case was argued, with great learning and ability, by
*Wells* and *T. A. Emmet*, for the plaintiffs, and *D. B. Ogden*
and *Hoffman*, for the defendants; but as the opinion of the
court was founded merely on the question of fact, that the
island of *Futa* was not, at the time, neutral territory, but
in the hostile possession of the *British*, and under the juris-
dicton and control of the *British* forces, it is unnecessary
to state the arguments of the counsel on the points raised in
the cause.

THOMPSON, Ch. J. delivered the opinion of the court.

The questions which have been made and discussed in
this case are, 1. Whether, admitting the island of *Futa* to
have been neutral territory, it was competent for a *British*
court of admiralty to proceed against and condemn the pro-
perty in question, whilst lying at that place. If not, then,
2. Whether, in point of fact, *Futa* was not, at the time, so
far a part of the *British* territory, or in the possession of
Admiral *Saumarez*, as to render valid the condemnation. In
the argument of the first question, we have been called upon
to review some of the principles laid down by this court in
the case of *Wheelwright* v. *Depeyster;* (1 *Johns. Rep.* 479.)
for although the principal question in that case was, whe-
ther a condemnation by a prize court, established in a
neutral country, was valid; yet the late chief justice, in pro-
nouncing the opinion of the court, went into an examina-
tion of the question, whether a prize court in the belligerent
country could proceed against a prize lying within the ter-
ritory of a neutral power; and upon a very able examination
of the point, was of opinion that it could not. A contrary
doctrine seems, however, to prevail in the supreme court
of the *United States*, according to the case of *Hudson and
others* v. *Guestier*. (4 *Cranch*, 293. 6 *Cranch*, 281.) The
high respect we entertain for that court, and the fitness and
propriety of a uniformity of decision, especially on questions
of this kind, might induce us again to turn our attention to

this question, if it had become necessary to the decision of the case before us. But thinking, as we do, that the condemnation was valid, on the other ground taken by the defendants' counsel, we forbear to touch the first point. The property in question, being a quantity of linens, was captured as prize, on board a *Danish* vessel, in *May*, 1812, by the *British* ship *Helder*, and in *July* following, carried by the captors into the harbour of the island of *Futa*, which is situated in *Wingo* sound, about 17 miles west of the city of *Gothenburg*, being one of the outermost *Swedish* islands. From the evidence, it is very satisfactorily established, that this island was some time before taken possession of by Vice Admiral Sir *James Saumarez*, in the name of his *Britannic* Majesty, and held as a place of rendezvous, for prizes taken by the *British* fleet, and to facilitate *British* commerce; that the *British* flag was flying in the harbour, and that no other naval or military force was stationed there; that, in point of fact, and for every naval, military, and commercial operation, the island could only be considered a *British* station; that it was not then held barely by permission of *Sweden*, but was taken and held, as a hostile measure, war having been declared by *Sweden* against *Great Britain*, in the year 1810. This declaration of war was probably made under the coercion of the Emperor of *France*, and we do not find any active hostile operations carried on; yet there was an existing state of war between *Great Britain* and *Sweden*, when possession was taken of this island, and there was no testimony whatever, to show that such possession was taken or held by permission of the *Swedish* government. This question was pressed upon most, if not all of the witnesses who were examined, and no one pretended to say that such permission was ever asked or obtained. On the contrary, several of the witnesses state explicitly, that the island was taken possession of by the *British* admiral, and held as a place of rendezvous, on account of the then existing war between *Great Britain* and *Sweden*; and that this was without the consent and permission of the *Swedish* government. Commissioners were appointed and established there, by and under the authority of the *English* admiralty, for the purpose of taking the examinations and

ALBANY, January, 1818.

PAGE v. LENOX.

ALBANY,
January, 1818.

PAGE
v.
LENOX.

depositions of witnesses, in the cases of prize vessels sent by *British* cruizers into this island. This commission was executed, at this place, under the protection of the *British* fleet there stationed, and without the consent of the *Swedish* government. We are fully warranted, from the testimony, in saying, that, from the time this island was taken possession of, no civil or military power was exercised there by the *Swedish* government, until after the treaty of peace, in *August*, 1812. Indeed, the case does not furnish us with any evidence, that this island was even then given up to *Sweden ;* and the treaty of peace is entirely silent on the subject.(*a*) One of the witnesses speaks of its being in possession of *Sweden* at the time of his examination, which was in the year 1815. I have not thought it necessary to refer particularly to the evidence of the several witnesses who have testified in relation to the possession of this island. The proof is clear, that when the prize was taken and carried in for examination, the island was, to all intents and purposes, in the undisturbed possession of the *British,* and considered a station for their naval and commercial operations ; and that it so continued until after the commencement of the admiralty proceedings, if not even down to the time of the condemnation, on the 2d of *September*, 1812. The time of the commencement of the admiralty proceedings does not, with certainty, appear ; and, it is not very important that it should, for the treaty of peace between *Great Britain* and *Sweden* may, perhaps, bear the construction of making the latter an ally of the former ; and there can be no question but that a condemnation of prizes brought into the port of an ally would be valid. (2 *Rob.* 209. 1 *Johns. Rep.* 434.) This, however, is barely thrown out, without intending to place the cause, in any measure, upon the construction of this treaty.

If, in point of fact, then, the island of *Futa* was in the possession, and under the jurisdiction and control of the

(*a*) The treaty, (art. 2.) recognised the *status quo ante bellum.*

*British* forces, there certainly can be no objection to a *British* court of admiralty proceeding against prizes, brought in there. None of the reasons which may be urged against a prize court proceeding to the condemnation of property, lying within the territory of a neutral power, can be applied to the case. The great objection to such proceedings is that the *res ipsa* is not within the possession, and under the control of the court, so that the sentence, or decree, could be enforced; the proceedings being *in rem*. But no such difficulty rests here. This prize remained not only in the possession of the captors, but at a place under the exclusive control of the sovereign of the captors. Here is all the possession necessary to give jurisdiction to a *British* court of admiralty. On this ground, therefore, we think the condemnation valid, and the right of the plaintiffs to the property in question thereby devested, and that the defendants are accordingly entitled to judgment.

ALBANY,
January, 1818.

Judgment for the defendants.